WILLIAM C. BRYSON, UNITED STATES CIRCUIT JUDGE
Before the Court are three motions to preclude expert testimony at trial, one filed by plaintiff Sonos, Inc., and two filed by defendants D & M Holdings Inc. d/b/a The D+M Group, D & M Holdings U.S. Inc., and Denon Electronics (USA), LLC (collectively, "D & M"). Sonos seeks to exclude the testimony of D & M's invalidity expert, Dr. Jay P. Kesan. Dkt. No. 292. D & M seeks to strike all or parts of the expert opinions of (1) Sonos's damages expert, Mr. Michael E. Tate; (2) Sonos's infringement expert, Dr. Kevin C. Almeroth; and (3) Sonos's invalidity expert, Dr. Andrew Wolfe. Dkt. Nos. 299 and 300. On October 30, 2017, the Court held a hearing on the motions, at which the Court ruled on some of the issues and took some under submission. This order addresses all of the issues raised by the parties in the three motions. Sonos's motion is GRANTED in part and DENIED in part. D & M's motions are GRANTED in part and DENIED in part.
*507 BACKGROUND
Sonos, a seller of wireless audio equipment, has asserted several patents against D & M, one of its competitors. The asserted patents cover five features that are offered in both Sonos's and D & M's networked wireless speaker products. Two of the patents, U.S. Patent Nos. 9,195,258 ("the '258 patent") and 9,202,509 ("the '509 patent"), which are referred to as the synchronization patents, allow for synchronized audio playback by two or more speakers. Two other patents, U.S. Patent Nos. 7,571,014 ("the '014 patent") and 8,588,949 ("the '949 patent"), referred to as the group volume control patents, allow for the volume of two or more speakers or speaker groups to be adjusted simultaneously. Two other patents, U.S. Patent Nos. 9,219,959 ("the '959 patent") and 9,212,959 ("the '959 patent"), referred to as the pairing patents, allow for two or more separate speakers to be paired to provide multi-channel sound. Another patent, U.S. Patent No. 9,042,556 ("the '556 patent"), referred to as the orientation patent, provides for shaping the audio output based on the orientation of the speaker, e.g., whether the speaker is horizontal or vertical. Finally, U.S. Patent No. 8,938,312 ("the '312 patent"), referred to as the autoplay patent, allows a speaker to detect an audio signal from an external source, such as the speaker's line-in input connector, and to select that source for playback when the external audio source begins outputting an audio signal. The two group volume control patents and one of the synchronization patents (the '258 patent ) are scheduled to be tried in a bellwether trial beginning December 11, 2017.
DISCUSSION
I. Legal Standard
Federal Rule of Evidence 702 allows a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to provide opinion testimony. The Rule specifies, however, that before allowing a witness to testify as an expert, the court must determine that "(a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.
Applying Rule 702, the Supreme Court has explained that when an expert's testimony is challenged, the district court has a "basic gatekeeping obligation" to ensure that the expert's testimony " 'is not only relevant, but reliable.' " Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ). When a jury is the finder of fact, the court's role is not to displace the jury, but to ensure that the expert's proffered testimony is sufficiently reliable and relevant to issues before the jury. See Fed. R. Evid. 702 Advisory Committee Notes (2000) ("[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." (quoting United States v. 14.38 Acres of Land Situated in Leflore Cty., Miss., 80 F.3d 1074, 1078 (5th Cir. 1996) ) ); United States v. Williams, 235 Fed.Appx. 925, 927 (3d Cir. 2007) ("The overriding consideration ... is that expert testimony should be admitted if it will assist the trier of fact."). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596, 113 S.Ct. 2786 ; see also *508 i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 852 (Fed. Cir. 2010) ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility.").
II. Sonos's Motion to Exclude Dr. Kesan's Expert Testimony on Invalidity
Sonos moves to exclude the expert testimony of Dr. Kesan on two grounds: first, because Dr. Kesan had no technical work experience in the pertinent art during the relevant time period; and second, because Dr. Kesan's report contains improper legal conclusions. For the reasons stated below, Sonos's motion is granted in part and denied in part.
a. Dr. Kesan's Qualifications
A witness may testify as a technical expert on issues such as noninfringement and invalidity only if "the witness is qualified as an expert in the pertinent art." Sundance, Inc. v. DeMonte Fabricating Ltd., 550 F.3d 1356, 1363 (Fed. Cir. 2008) (finding it an abuse of discretion to allow expert testimony on invalidity and noninfringement from a patent attorney who lacked a technical background in the relevant art). Such an expert must possess at least ordinary skill in the pertinent art, although there is no requirement that "a witness possess something more than ordinary skill in the art to testify as an expert." Id.
The Third Circuit has interpreted the "qualification" requirement liberally, explaining: "Qualification requires that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert as such." Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003) ; see also Evonik Degussa GmbH v. Materia Inc., No. 09-cv-636, 2016 WL 337378, at *14 (D. Del. Jan. 26, 2016). An expert should not be excluded "simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008) (allowing an engineer to testify about the inadequacy of a warning in a service manual for an automotive rear liftgate, even though the expert was not substantively qualified in the design of automobile rear liftgates or the drafting of service manual warnings); see also Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996) (accepting more general qualifications in holding that a treating physician did not have to practice a particular specialty in order to testify concerning certain matters). To the contrary, the inquiry is "flexible" and "[a]ny dispute between the parties about the strength of the evidence in this case should be resolved by the jury." Thomas & Betts Corp. v. Richards Mfg. Co., 342 Fed.Appx. 754, 761 (3d Cir. 2009) (alteration in original) (quoting Pineda, 520 F.3d at 248-49 ).
Dr. Kesan's report describes a person of ordinary skill in the art as someone who "would be familiar with digital and analog circuits, wireless communication, and the client-server environment" and who "would have a Bachelor's degree in Electrical Engineering with at least two years of relevant work experience or equivalent." Expert Report of Jay P. Kesan Regarding the Invalidity of Asserted Claims of U.S. 9,219,959, 7,571,014, 8,588,949, 9,042,556, 9,202,509, 8,938,312, 9,213,357, 9,195,258, and 8,938,637 ("Kesan Report"), Dkt. No. 307, Ex. A ¶ 106. The report of Sonos's expert, Dr. Almeroth, describes a person of ordinary skill in the art as "a person having the equivalent of a four-year degree from an accredited institution (usually *509 denoted as a B.S. degree) in computer science, computer engineering, electrical engineering, or the equivalent, and approximately 2-4 years of professional experience in the fields of networking and consumer audio systems, or an equivalent level of skill and knowledge."Opening Expert Report of Dr. Kevin C. Almeroth ("Almeroth Report"), Dkt. No. 311, Ex. E-3 ¶ 35. Dr. Almeroth explained in his deposition that the level of skill needed for a person to be considered one of ordinary skill in the art pertinent to this case is not demanding, that "in some instances a master's degree can substitute for some or all of the professional experience," and that "by the time you get to the level of a Ph.D., you have person who's beyond ordinary skill in the art." Dkt. No. 347-1, Ex. 44, at 82:8-25.
Sonos argues that Dr. Kesan is not a person of ordinary skill in the art, because of his lack of technical work experience in the pertinent art at the time of the invention. Sonos contends that Dr. Kesan is simply an attorney and a law professor who has done no relevant technical work for more than 25 years. Most importantly, according to Sonos, Dr. Kesan has never worked in the field of "consumer networked audio technology," and in particular he did not work in that field in the early 2000s, when consumer networked audio products were first emerging.
The Court is satisfied that Dr. Kesan's qualifications are sufficient to make his testimony helpful to the jury in understanding the evidence in this case. Dr. Kesan holds a B.S. degree in electrical engineering and both a M.S. and a Ph.D. in electrical and computer engineering. During his professional career, he has conducted research on the use of radio frequency technologies for use in wireless communications. Kesan Report App. B; Declaration of Dr. Jay P. Kesan ("Kesan Decl."), Dkt. No. 345 ¶ 6. After completing his education, Dr. Kesan was employed for four years at the IBM T.J. Watson Research Center as a research staff scientist, where he worked on integrated chip technology. Kesan Report App. B; Kesan Decl. ¶ 7. Dr. Kesan then went to law school. Since his graduation from law school in 1999, Dr. Kesan has focused on the intersection of law and technology. He is currently affiliated with both the College of Law and the Department of Electrical and Computer Engineering at the University of Illinois. Kesan Report App. B.
Although in recent years Dr. Kesan has devoted much of his time to activities related more to law than to engineering, he has continued to work on radio frequency identification devices and has been issued a number of patents in that field of technology. Dkt. No. 371-1, Ex. I at 8:15-20, 260:6-12. He has also worked as a consulting expert in wired, wireless, and cellular communication technologies, Kesan Decl. ¶ 11, and he has served as a technical expert in patent lawsuits regarding various communication technologies, id. ¶ 12. In short, although his career has not been devoted exclusively to work as an electrical engineer and computer scientist, and although he has not specialized in the study of consumer networked audio technology, Dr. Kesan has a combination of education and work experience that is, at the least, equivalent to a person having a bachelor's degree and approximately two to four years of professional experience in the electrical engineering, computer science, and communication fields.
Sonos discounts Dr. Kesan's experience by pointing out that he lacks two to four years of experience in "consumer networked audio technology." Dkt. No. 370, at 1. But that argument draws the scope of the pertinent art too narrowly. Both Dr. Kesan and Dr. Almeroth agree that the pertinent art includes electrical engineering *510 and circuitry, computer science and engineering, and networking and wireless communications. However, Dr. Almeroth contends that the pertinent art is further limited to "networking and consumer audio systems, or an equivalent level of skill and knowledge." Almeroth Report ¶ 35. And in its reply brief, Sonos suggests that the pertinent field of art is even narrower than that, being limited to consumer networked audio technology and not including "general networking concepts." Dkt. No. 370, at 1.
The question for the Court in assessing an expert's field of expertise is whether the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). In order for an expert to have such knowledge, it is not necessary that the expert have expertise in the precise technology that is the subject of the patent or patents in suit. See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994) (" Rule 702's liberal policy of admissibility extends to the substantive as well as the formal qualification of experts. We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications."); Knight v. Otis Elevator Co., 596 F.2d 84, 87-88 (3d Cir. 1979) (holding that an expert could testify that unguarded elevator buttons constituted a design defect despite expert's lack of specific background in design and manufacture of elevators).
The danger of defining the scope of the pertinent art too narrowly is that it may exclude experts with relevant technical backgrounds. Particularly in a field involving new and emerging technology, there may be few experts with the kind of highly specialized expertise that Sonos is demanding. The Court is satisfied that Dr. Kesan's technical expertise is sufficiently related to the subject matter of the patents in suit to be helpful to the jury in understanding the evidence and making appropriate findings with respect to the facts of the case. Sonos's challenges to the specificity of Dr. Kesan's expertise go more to the weight of his testimony and are therefore better left for the jury to assess. See Thomas & Betts, 342 Fed.Appx. at 761.
The case law that Sonos cites is not to the contrary. In Sundance, Inc. v. DeMonte Fabricating Ltd., the Federal Circuit held that the district court abused its discretion in allowing a patent attorney with extensive experience in patent law and procedure to testify about noninfringement and invalidity. 550 F.3d at 1361. The court did so because the attorney had "no experience whatsoever" in the pertinent art and was, therefore, not qualified to testify as an expert. Id. at 1363. Similarly, in Proveris Scientific Corp. v. Innovasystems, Inc., 536 F.3d 1256 (Fed. Cir. 2008), the Federal Circuit affirmed a district court's ruling that prohibited a mechanical engineer who specialized in satellite design from testifying about the development of drug delivery devices and laboratory equipment. Id. at 1268. And in Aloe Coal Co. v. Clark Equipment Co., 816 F.2d 110 (3d Cir. 1987), the Third Circuit held that the district court abused its discretion in allowing a tractor sales representative to testify as an expert regarding the cause of a tractor fire. Id. at 114. Dr. Kesan, with nearly a decade of education in electrical engineering and subsequent work on circuitry and communication technology, is far removed from those examples. His testimony therefore will not be excluded based on a lack of sufficient qualifications. Sonos's challenge to Dr. Kesan's qualifications to testify as an expert in this case is therefore denied.
*511 b. Improper Legal Conclusions
Sonos also seeks to exclude Dr. Kesan's testimony on the ground that he "improperly opines on numerous legal topics." Dkt. No. 336, at 9. Although courts typically forbid parties from calling "legal experts" to testify about the requirements of the law, technical experts are not forbidden from offering opinions on technical matters that lead them to particular conclusions that bear on ultimate issues in the case. See, e.g., Sundance, 550 F.3d at 1364. Moreover, patent law experts are frequently permitted to testify about matters such as general practices and procedures employed by the PTO in examining or reexamining patents. W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc., Civil Action No. 11-515, 2015 WL 12815314, at *3 (D. Del. Nov. 20, 2015) ; Brigham & Women's Hosp., Inc. v. Teva Pharm. USA, Inc., Civil Action No. 08-464, 2010 WL 3907490, at *1 (D. Del. Sept. 21, 2010) ; see also Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc., 87 F.Supp.3d 928, 946-47 (N.D. Cal. 2015) ; Wright Asphalt Prods. Co., LLC v. Pelican Refining Co., LLC, Civil Action No. H-09-1145, 2012 WL 1936416, at *7-10 (S.D. Tex. May 29, 2012) ; Szoka v. Woodle, No. 02-cv-5524, 2004 WL 5512964, at *3 (N.D. Cal. June 7, 2004) ; Bausch & Lomb, Inc. v. Alcon Labs., Inc., 79 F.Supp.2d 252, 255-56 (W.D.N.Y. 2000). Sonos has not pointed to any particular portions of Dr. Kesan's report that constitute opinion evidence about the requirements of the law, and the Court therefore sees no reason to address that claim.
Sonos's contention that "Dr. Kesan's improper legal opinions are scattered throughout various sections and appendices of the Kesan Report," Dkt. No. 336, at 9, is too general a complaint for the Court to address in any meaningful way. Does Sonos expect the Court to review all 1315 pages of Dr. Kesan's Report and Rebuttal Report in search of the "improper legal opinions" that are assertedly "scattered throughout various sections and appendices" of those reports? Without any more specificity than that, the Court is unable to address Sonos's objection and therefore deems that objection waived.
Relatedly, Sonos makes the broad assertion that "the numerous, varied legal topics addressed in the Kesan Report make clear that Dr. Kesan, who is not a person of ordinary skill in the art in this case, is simply making attorney arguments clothed as expert testimony that go beyond the practices and procedures at the Patent Office." Dkt. No. 336, at 9. But the Court has already concluded that Dr. Kesan is sufficiently skilled in the art to testify as a technical expert. His testimony on technical factual issues leading to a conclusion of invalidity will therefore not be excluded. Moreover, as noted above, a person familiar with the practices of the U.S. Patent and Trademark Office, Dr. Kesan is competent to testify as to issues of patent practice, and his opinions on those subjects are sufficiently reliable to submit to the jury.
Beyond its general complaints about Dr. Kesan's purported legal opinions, Sonos raises several specific objections to Dr. Kesan's report in the "Legal Opinions" portion of its motion. Dkt. No. 336, at 9-11. In particular, Sonos objects to Dr. Kesan's analysis of secondary considerations, such as commercial success and copying. Sonos contends that Dr. Kesan has merely stated ultimate conclusions without supporting facts. Dkt. No. 336, at 10. As to certain aspects of Sonos's challenge to Dr. Kesan's testimony, the Court agrees.
First, Dr. Kesan's report contains a single paragraph addressing commercial success as a secondary consideration bearing on the issue of obviousness. In that paragraph, the report asserts that "it appears that the primary reason for [Sonos's]
*512 commercial success is the availability of [Universal Plug and Play (UPnP) compatible] controllers, such as for PCs and smart phones." Kesan Report ¶ 123. The report continues:
Without such controllers, Sonos would have to sell a dedicated controller for its devices, which would have made the Sonos product line no different from that of the many other manufacturers of home audio equipment. In addition, UPnP enabled the Sonos speakers to operate, and there is no evidence that Sonos would have been able to make a product if it was unable to use UPnP.
Id. Dr. Kesan provided no evidentiary support for his conclusion that the availability of UPnP-compatible controllers was the primary reason for Sonos's commercial success. Because Dr. Kesan's opinion on that issue is not supported by reference to any evidence, it does not satisfy the requirement of Rule of Evidence 702(b) that the testimony be "based on sufficient facts or data." Moreover, the assertion does not appear to be based on Dr. Kesan's expertise in electrical engineering and computer science or any undisclosed familiarity with the home audio equipment market. It therefore does not satisfy the requirement of Rule of Evidence 702(a) that the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in evidence."
D & M's only response to Sonos's argument on that point is that "the challenged opinions are technical in nature." Dkt. No. 357, at 16. According to D & M, Dr. Kesan "is thus qualified, and has basis for, opining about the differences between UPnP, Sonos's, and other technology in the field, as well as the implementations of these technologies." Id. But D & M's reply is a non-sequitur. Dr. Kesan may well be familiar with the technical features of UPnP, but that does not mean that he has any reason to know, without reference to any supporting evidence, that the availability of UPnP-compatible controllers was the primary reason for the commercial success of Sonos's products. The Court will exclude Dr. Kesan's testimony on that issue.
Second, Dr. Kesan's report briefly asserts that Sonos copied devices that were in the marketplace when it drafted the claims of its patents-in-suit. Kesan Report ¶ 126. The report states that because "there were many systems that were in operation and commercially successful prior to the filing of the applications for the Asserted Patents," it is "more likely" that Sonos copied prior art. Id. Dr. Kesan provides no support for that assertion. And when discussing unsuccessful attempts by others, Dr. Kesan again concludes, without explanation or citation, that the success of UPnP and competing products by other companies suggests that Sonos "merely copied" those inventions. Id. ¶ 127. Copying may be proved by evidence such as internal documents, comparison of the devices, and analysis by witnesses of the similar features of the devices. See Iron Grip Barbell Co. v. USA Sports, Inc., 392 F.3d 1317, 1325 (Fed. Cir. 2004). Dr. Kesan's report, however, contains no such evidence. His barebones conclusion that Sonos copied the prior art will therefore be excluded.
Sonos separately objects to the portions of Dr. Kesan's report that are directed to invalidity on grounds of lack of enablement and indefiniteness. Dkt. No. 336, at 10-11. Sonos's objection is based on its contention that Dr. Kesan's opinions on that subject were provided in "his capacity as a legal expert and not a technical expert in the pertinent art." Dkt. No. 336, at 10. Sonos does not point to any specific statements in that regard by Dr. Kesan, but once again simply contends that Dr. Kesan's "speculative and conclusory opinions *513 are scattered throughout the Kesan Report." Id.
The Court rejects Sonos's motion to strike all of Dr. Kesan's opinions on enablement and indefiniteness. It has generally been held to be permissible for a technical expert in a patent case to provide an opinion on questions such as whether an asserted patent claim, as construed by the court, reads on an accused product, or whether a claimed invention would have been obvious to a person of ordinary skill in the art at the time of the patent application. See Sundance, 550 F.3d at 1364 ; Symbol Techs., Inc. v. Opticon, Inc., 935 F.2d 1569, 1575 (Fed. Cir. 1991) ; Snellman v. Ricoh Co., 862 F.2d 283, 287 (Fed. Cir. 1988) ; StoneEagle Servs., Inc. v. Pay-Plus Solutions, Inc., No. 8:13-cv-2240, 2015 WL 3824170, at *4 (M.D. Fla. June 19, 2015) ; Implicit Networks Inc. v. F5 Networks Inc., No. C 10-3365, 2013 WL 1007250, at *11 (N.D. Cal. Mar. 13, 2013) ; Lamoureaux v. Anazaohealth Corp., No. 3:03-cv-1382, 2009 WL 1162875, at *6 (D. Conn. Apr. 30, 2009) ; Keytrack Inc. v. Key Register, LLC, No. C 03-870, 2004 WL 2944043, at *1-2 (N.D. Cal. Mar. 30, 2004) ; Elan Corp., PLC v. Andrx Pharms., Inc., 272 F.Supp.2d 1325, 1353 (S.D. Fla. 2002), rev'd on other grounds, 366 F.3d 1336 (Fed. Cir. 2004) ; Donnelly Corp. v. Gentex Corp., 918 F.Supp. 1126, 1137 (W.D. Mich. 1996) ; see also Fed. R. Evid. 704(a) (expert opinion "is not objectionable just because it embraces an ultimate issue").
Enablement and indefiniteness are both assessed in light of the perspective of a person of ordinary skill in the art. See Nautilus, Inc. v. Biosig Instruments, Inc., --- U.S. ----, 134 S.Ct. 2120, 2128, 189 L.Ed.2d 37 (2014) ; Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1365 (Fed. Cir. 1997). Those issues are therefore proper subjects for adequately supported expert testimony. See Icon Health & Fitness, Inc. v. Polar Electro Oy, 656 Fed.Appx. 1008, 1014-15 (Fed. Cir. 2016) ; ALZA Corp. v. Andrx Pharms., LLC, 603 F.3d 935, 941-42 & n.8 (Fed. Cir. 2010). Sonos has not pointed to any particular portion of Dr. Kesan's testimony on enablement or indefiniteness that is inadequately supported or falls outside his role as a technical expert. Accordingly, the Court rejects Sonos's categorical objection to Dr. Kesan's testimony bearing on the issue of invalidity.
The Court grants in part and denies in part Sonos's motion to exclude Dr. Kesan's expert testimony on invalidity.
III. D & M's Motion to Preclude Testimony from Mr. Tate
D & M moves to bar testimony on damages from Sonos's damages expert, Mr. Tate, on the ground that his opinions misapply established law in two respects. Dkt. No. 299. First, D & M contends that Mr. Tate's reasonable royalty opinion is unreliable because it fails to apportion damages to the accused features and instead uses the full sales price of the accused HEOS devices as the royalty base. Second, D & M contends that Mr. Tate's lost profits analysis is unreliable because it fails to demonstrate that there were no acceptable non-infringing alternatives to which D & M could have turned to avoid infringing Sonos's patents and because it fails to analyze the non-infringing alternatives on a customer-by-customer basis. D & M's motion is granted in part and denied in part.
a. Mr. Tate's Reasonable Royalty Opinion
In his damages report, Mr. Tate sought to determine Sonos's reasonable royalty damages beginning in March 2014, when D & M began selling its allegedly infringing HEOS products. See Expert Report of Michael E. Tate ("Tate Report"), Dkt. No. 310, at 61-112. In so doing, Mr. Tate analyzed the 15 factors set forth in *514 Georgia Pacific Corp. v. U.S. Plywood Corp., 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970), which provide guidance for approximating the result of a hypothetical license negotiation between a patentee and an alleged infringer. Among other considerations, Mr. Tate relied on a report produced by KPMG that was produced on D & M's behalf in January 2015. In that report, KPMG summarized the results of its research on royalty agreements in the consumer audio industry. The report concluded that patent royalty rates in the consumer audio industry ranged in amount from 2% to 25% of revenue, with a median of 6%. Tate Report, at 66-67. Using the KPMG report as his benchmark, Mr. Tate concluded that D & M would have agreed to pay at least 6% of its revenue for Sonos's patents relating to the group volume control and synchronization features, and at least 2% of its revenue for the pairing, autoplay, and speaker orientation patents. Id. at 110-11. In calculating a reasonable royalty, Mr. Tate multiplied those royalty rates by the total revenue derived by D & M from the sales of all of its HEOS products except for those on which Sonos was seeking damages under a lost profits theory.
D & M argues that Mr. Tate's reasonable royalty opinion is unreliable because Mr. Tate failed to apportion damages to the accused features. Dkt. No. 299, at 6-13. A patentee is entitled to damages that are related to the patented features of a product, but not to unpatented features found in the same product. For that reason, it is well established that the patentee must provide "evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features" or demonstrate that "the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1318 (Fed. Cir. 2011) (quoting Garretson v. Clark, 111 U.S. 120, 121, 4 S.Ct. 291, 28 L.Ed. 371 (1884) ); see also Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc., 809 F.3d 1295, 1301 (Fed. Cir. 2015) (Under the patent damages statute, 35 U.S.C. § 284, "damages awarded for patent infringement 'must reflect the value attributable to the infringing features of the product, and no more.' " (quoting Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1226 (Fed. Cir. 2014) ) ).
It is often difficult to assign value to a patented feature that was never packaged and sold separately from the whole unit. In this case, neither Sonos, D & M, nor any other company appears to have sold, for example, a stand-alone software update that would have enabled group volume control or stereo pairing features for an additional fee. Nonetheless, even in that situation, when the smallest salable unit is a multi-component product containing several non-infringing features with no relation to the patented feature, "the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology." Virnetx, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1327 (Fed. Cir. 2014).
The entire market value rule is an expression of the requirement of apportionment. The rule "is designed to account for the contribution of the patented feature to the entire product." AstraZeneca AB v. Apotex Corp., 782 F.3d 1324, 1338 (Fed. Cir. 2015). The rule requires that "where multi-component products are involved, ... the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." Ericsson, 773 F.3d at 1226. Thus, the entire market value rule ordinarily prohibits the presentation of evidence to a jury that uses the entire market value of a multi-component product, which includes both *515 patented and unpatented features, as the royalty base in calculating royalty damages. Id. Although a reasonable royalty could be fashioned using the entire market value of the product-by multiplying the entire market value by a very low royalty rate[1] -that approach is prohibited because it " 'carries a considerable risk' of misleading a jury into overcompensating" the patentee and resulting in excessive damages awards. Id. (quoting LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 67-68 (Fed. Cir. 2012) ); Uniloc, 632 F.3d at 1320 ("The Supreme Court and this court's precedents do not allow consideration of the entire market value of accused products for minor patent improvements simply by asserting a low enough royalty rate.").
The need for apportionment can be avoided if the patentee establishes that its "patented technology drove demand for the entire product." Virnetx, 767 F.3d at 1329. However, a patentee may "assess damages based on the entire market value of the accused product only where the patented feature creates the basis for customer demand or substantially creates the value of the component parts." Id. at 1327 (quoting Versata Software, Inc. v. SAP Am., Inc., 717 F.3d 1255, 1268 (Fed. Cir. 2013) ). In Virnetx, for instance, the plaintiff's damages expert made no attempt to separate the two patented software features-the FaceTime and VPN-on-Demand features-from the iPhone hardware or other software components included therein. Id. The court held that it was not enough that the patented features could be "viewed as valuable, important, or even essential." Id. (quoting LaserDynamics, 694 F.3d at 68 ). In order to use the entire market value of the product as the royalty base, the court explained, the patentee must prove that "the presence of that [patented] functionality is what motivates consumers to buy [the multi-component product] in the first place." LaserDynamics, 694 F.3d at 68.
Mr. Tate's analysis does not satisfy that burden. As described in Sonos's brief, Mr. Tate's damages testimony relies on evidence of (i) the "advantages and importance of Sonos's patented ... technology in the form of recognition and praise it has received"; (ii) Sonos's advertising and marketing of the patented technology; (iii) D & M's recognition of the importance of the patented technology and D & M's desire to include those features; (iv) consumers' expectations and demand for the patented features; and (v) D & M's advertising and marketing of the patented features. Dkt. No. 341, at 14. However, LaserDynamics makes clear that evidence of that sort is insufficient:
It is not enough to merely show that the disc discrimination method is viewed as valuable, important, or even essential to the use of the laptop computer. Nor is it enough to show that a laptop computer without an [optical disk drive] practicing the disc discrimination method would be commercially unviable. Were this sufficient, a plethora of features of a laptop computer could be deemed to drive demand for the entire product. To name a few, a high resolution screen, responsive keyboard, fast wireless network receiver, and extended-life battery are all in a sense important or essential features to *516 a laptop computer; take away one of these features and consumers are unlikely to select such a laptop computer in the marketplace. But proof that consumers would not want a laptop computer without such features is not tantamount to proof that any one of those features alone drives the market for laptop computers.
694 F.3d at 68 (emphasis added). The arguments made by Sonos, that the patented features are desirable and important or even essential, are not sufficient to prove that those features alone drive the market for the HEOS products.
The flaw in Mr. Tate's reasoning is underscored by the fact-raised in D & M's opening brief and not adequately addressed in Sonos's opposition-that at least half of all HEOS owners own only one HEOS product. Dkt. No. 414, Ex. D ¶ 62 & n.140 (describing various sources of evidence that indicate that between 49% and 63% of HEOS customers own only one product). That is to say, at least half of all HEOS owners cannot use the synchronization, group volume control, or pairing features described in Sonos's patents, at least not without purchasing another HEOS unit. Therefore, it can be assumed that those features are not the driving factor in those customers' purchasing decisions.[2] But Mr. Tate did not adjust his calculations to take account of the one-HEOS-only customer purchases before using the entire market value for all of D & M's speaker sales as his royalty base.
Similarly, Sonos has not demonstrated that the orientation and autoplay features are so central to the utility of the D & M products as to justify the use of the entire market value as the royalty base. Sonos launched its PLAY:5 product in November 2009 without the orientation feature; it added that feature in its second generation speaker in November 2015. Dkt. No. 299, at 13. Yet, the evidence in the record indicates that sales of the PLAY:5 were higher in 2014 and 2015 than they were in 2016. Tate Report, Ex. 11.1. Even assuming, as Mr. Tate states, that the orientation feature is "important" and "necessary to achieve optimal sound quality," Tate Report at 31, Mr. Tate has not stated, and Sonos has not pointed to other evidence, that the presence of the orientation feature is what motivates consumers to buy the product. Similarly, although the autoplay feature is a desirable function that makes D & M's sound bar a "competitive and functional product," id. at 27, Mr. Tate has provided no evidence that the autoplay feature, on its own, drives sales of the D & M products. To the contrary, the autoplay feature in Sonos's PLAYBAR is an optional setting that can be enabled or disabled. The optional nature of the autoplay feature suggests that the feature is not universally desired and does not drive demand for at least those customers who prefer to have the feature disabled. See id. at 27 n. 101.
Mr. Tate's reasonable royalty analysis fails to consider the customers who were not induced to purchase a HEOS device based on the five features recited in the Sonos patents. Instead, Mr. Tate assumes that the royalty base should be the entire market value of the HEOS devices, and he estimates the reasonable royalty accordingly. Because Mr. Tate neither considered the value of the allegedly infringing features in relation to the product as a whole, nor showed that those features alone drive consumer demand, his opinion as to the *517 amount of a reasonable royalty for the HEOS products is methodologically unsound. Mr. Tate will therefore not be allowed to testify at trial as to the reasonable royalty theory set forth in his report.
b. Mr. Tate's Lost Profits Analysis
Mr. Tate's report also provides an analysis of the profits that Sonos claims to have lost as a result of D & M's alleged infringement. In calculating Sonos's lost profits damages, Mr. Tate applied the four factors outlined in the Sixth Circuit's decision in Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152 (6th Cir. 1978) (Markey, J., sitting by designation). See Tate Report, 37-61. The Panduit factors provide a " 'useful, but non-exclusive' method to establish the patentee's entitlement to lost profits." Mentor Graphics Corp. v. EVE-USA, Inc., 851 F.3d 1275, 1284 (Fed. Cir. 2017) (quoting Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc) ). The Panduit test seeks to answer the question: "[H]ad the Infringer not infringed, what would the Patent Holder-Licensee have made?" Id. (alteration in original) (quoting Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 507, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964) ). Under the Panduit test, a patentee seeking lost profit damages must establish: "(1) demand for the patented product; (2) absence of acceptable non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit it would have made." Id. (quoting Panduit, 575 F.2d at 1156 ).
Mr. Tate's analysis begins with a discussion of the strong demand for wireless multi-room audio systems that include the five patented features disclosed in the patents-in-suit, and his conclusion that D & M viewed those features as desirable when D & M launched its HEOS products. Mr. Tate explained that D & M could not have produced a competing product that did not infringe Sonos's patents, and that Sonos had the manufacturing and marketing capabilities to meet the demand for all the sales made to D & M. Finally, assuming that Sonos would have sold additional products but for D & M's infringement, Mr. Tate concluded that D & M's accused sales would have been divided between Sonos and the other competitors in the wireless multi-room audio system market based on their market share. He therefore multiplied D & M's sales by Sonos's market share to calculate the lost sales, and thus the lost profits due to Sonos.
D & M asserts that Mr. Tate's lost profits analysis does not properly prove entitlement to lost profits. The parties' dispute is focused on the second prong of the Panduit test, which requires the patentee to demonstrate the absence of acceptable non-infringing alternatives. That requirement exists because, if the customer might have purchased a different, non-infringing product, the patentee cannot establish entitlement to lost profits for that particular sale. That determination is "made on a customer-by-customer" basis. A patentee may therefore prove "entitlement to lost profits for some of its sales, but not others." Mentor Graphics, 851 F.3d at 1286. In constructing the "but for" market, a "fair and accurate reconstruction" must consider "alternative actions the infringer foreseeably would have undertaken had he not infringed." Grain Processing Corp. v. Am. Maize-Prod. Co., 185 F.3d 1341, 1350-51 (Fed. Cir. 1999). "[A]n accurate reconstruction of the hypothetical 'but for' market takes into account any alternatives available to the infringer," and it cannot simply be assumed that the infringer would leave the market altogether "if it can compete in some other lawful manner." Id. at 1351.
In his discussion of the second Panduit factor, Mr. Tate states that there are "no *518 acceptable, non-infringing alternatives to the inventions claimed in the patents-in-suit," because all such alternatives either (1) infringe one or more of Sonos's patents, (2) "are not commercially acceptable substitutes because they lack the advantages of the patented products," or (3) "are not alternatives because they merely remove the patented features, among other deficiencies." Id. at 54. Mr. Tate provides no substantive analysis to support that conclusion, but instead relies exclusively on Dr. Almeroth's report.
Dr. Almeroth, in turn, devotes approximately 25 pages to refuting a document entitled "Project Estimates: Modifications to HEOS System," which is dated October 25, 2016, and which "relates to D & M's claim that there are commercially acceptable non-infringing alternatives to the Sonos Patents." Almeroth Report ¶ 652; see also id. ¶¶ 652-710. Dr. Almeroth argues that D & M would be unable to produce commercially acceptable alternatives of its products that do not infringe Sonos's patents, and thus it would be safe to assume that the sales that were made by D & M would otherwise have gone to D & M's competitors, one of which is Sonos.
However, Sonos's contention that there are no commercially acceptable non-infringing alternatives suffers from a significant flaw. Although Dr. Almeroth argues that D & M could not offer a commercially acceptable non-infringing alternative, Mr. Tate acknowledges that other alternatives exist on the market. Specifically, Mr. Tate calculates that Sonos's share of the market for wireless multi-room speakers ranged from 93.6% in March 2014 to 41.0% in December 2016. Tate Report, Ex. 6.2. Mr. Tate recognized that Bose, Samsung, and Google, among others, offer competing retail products. Id. He also analyzed Sonos's market share in the custom integration market, in which Sonos also faces competition. Id. Exs. 6.3, 6.4. Neither Mr. Tate nor Dr. Almeroth contended that Bose, Samsung, or Google infringes Sonos's patents. Dr. Almeroth's analysis is limited to describing why D & M could not produce a non-infringing alternative. In calculating lost profits, Mr. Tate even acknowledged that "some of the accused HEOS product sales would have been made by other companies in the U.S. market based on each company's relative share of the U.S. wireless multi-room audio market." Tate Report at 55. It appears, then, that Dr. Almeroth did not dispute that there are commercially acceptable non-infringing alternatives offered by other companies.[3]
This flaw is not fatal to Mr. Tate's lost profits analysis, however. The Federal Circuit has condoned the use of the "market share" approach that Mr. Tate applied as an alternative to showing the absence of acceptable non-infringing alternatives. "In a complex market with numerous competitors, a patentee may be awarded lost profit[s] damages calculated using its market share among its competitors." Mentor Graphics, 851 F.3d at 1286 n.5 (citing State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1577-78 (Fed. Cir. 1989) ). The market share approach allows a patentee to "satisfy the second Panduit element by substituting proof of its market share for proof of the absence of acceptable alternatives" and it "allows a patentee to recover lost profits, despite the presence of acceptable, noninfringing substitutes, because it nevertheless can prove *519 with reasonable probability sales it would have made 'but for' the infringement." BIC Leisure Prod., Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1219 (Fed. Cir. 1993). The market share approach reasonably approximates the profits the patentee would have earned in a multiparty market but for the infringement. Therefore, a patentee may be entitled to a mixed damages award consisting of both lost profits damages for the infringer's sales based on the patentee's market share, and reasonable royalty damages for the remainder. Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc., 246 F.3d 1336, 1356 (Fed. Cir. 2001) (citing State Indus., 883 F.2d at 1573, 1578 ). Mr. Tate employed that method of damages calculation as part of his overall determination of the amount of Sonos's lost profits on certain sales and the amount of the reasonable royalties on the remaining sales. See Tate Report Ex. 4.
D & M does not address Mr. Tate's market share approach in its opening brief, see generally Dkt. No. 299, but in its reply D & M raises essentially two arguments in response to that theory. Neither is persuasive.
First, D & M argues that "before using the 'market approach,' Mr. Tate was required to define the relevant market based on consumer demand for patented features." Dkt. No. 373, at 1. However, Mr. Tate did exactly that, describing the "wireless multi-room audio system market" and the primary competitors in both the retail and custom integration markets. Tate Report at 35-36. Mr. Tate further described how and why he used certain data sets to analyze market share. Id. at 59.
D & M disagrees with the way Mr. Tate defined the market. The rebuttal report of D & M's expert, Mr. John R. Bone, argues that "Mr. Tate fails to correctly define the multiple market segments in which the accused products are sold. Instead, Mr. Tate improperly groups all products and all customers into a single market segment, the 'wireless multi-room audio market,' failing to consider nuances that lead to a more broadly defined market for certain products or certain customer groups. He further fails to properly define the custom integration channel, significantly overstating Sonos' market share in that market." Dkt. No. 309, Ex. D ¶ 58. However, whether Mr. Tate or Mr. Bone has more persuasively defined the market is a question for the jury. Mr. Tate has defined the market and analyzed Sonos's market share in a manner that could be helpful to the jury and is relevant and supported by evidence.
Second, D & M argues that Mr. Tate has improperly assumed that D & M's customers would not buy an infringing HEOS device with the infringing features removed, and that Mr. Tate failed to consider that only certain HEOS products infringed certain of Sonos's patents. Dkt. No. 373, at 3-4. However, Dr. Almeroth's report, on which Mr. Tate relies, performs exactly that analysis. For example, with regard to the group volume control patents, Dr. Almeroth addresses five alternatives proposed by D & M and argues why each is a not an acceptable non-infringing substitute for the infringing product. Almeroth Report ¶¶ 675-79. Although D & M challenges Dr. Almeroth's conclusions about whether or not D & M's non-infringing alternatives are commercially acceptable, D & M did not move to strike Dr. Almeroth's analysis on that ground. In any event, resolution of whether the alternatives are commercially acceptable is a question that is properly left for the jury.
Accordingly, D & M's motion to strike Mr. Tate's lost profits analysis is denied.
IV. D & M's Motion to Strike
a. Dr. Almeroth and Mr. Tate's Reliance on Undisclosed Fact Witnesses
In its motion, D & M moves to strike sections of Dr. Almeroth's and Mr. Tate's *520 expert reports that relied on previously undisclosed witnesses. Dkt. No. 300, at 2-9. The parties have since resolved this issue between themselves and have stipulated that those portions of D & M's motion are now moot. Dkt. Nos. 360, 361.
b. Dr. Wolfe's Opinions on the "Player" Terms
D & M seeks to strike Dr. Wolfe's opinions regarding the terms "player," "zone player," and "playback device" as being contrary to Judge Andrews' claim construction ruling. Dkt. No. 300, at 9-11. First, D & M takes issue with Dr. Wolfe's opinions that imply that a "player" must be capable of "actually rendering (i.e., playing) audio content." Id. at 10 (quoting Opening Rebuttal Expert Report of Andrew Wolfe ("Wolfe Rebuttal Report"), Dkt. No 315, Ex. E-15 ¶ 215). Second, D & M contends that Dr. Wolfe's analysis improperly excludes playback devices that "transmit[ ] audio data packets over a network." Id. at 11 (quoting Wolfe Rebuttal Report ¶ 218). The Court finds neither ground persuasive.
In his claim construction order, Judge Andrews ruled that the terms "zone player," "playback device," and "player" should be construed to mean "data network device configured to process and output audio." Dkt. No. 219 at 8. After discussing the extrinsic evidence, Judge Andrews concluded that a "player" does not need to have an integrated speaker or speaker transducer, but that it must contain an audio processing circuit. Id. at 9-11. Thus, Judge Andrews reasoned, a "playback device" may "output audio either in the form of an audio signal to an external speaker or as sound waves from an integrated speaker." He therefore held that the term "audio information" could "take the form of either an electrical signal or sound waves." Id. at 15-16.
Dr. Wolfe's opinion as to the term "player" is consistent with those claim constructions. First, Dr. Wolfe requires that a "player" be capable of "actually rendering (i.e., playing) audio content." Wolfe Rebuttal Report ¶ 215. Dr. Wolfe's report does not, as D & M argues, imply that a "player" must have an integrated speaker. Instead, it is clear that a playback device must simply "process and output audio," id., which is consistent with the claim construction order. As Dr. Wolfe explained in his deposition, by using the term "render" he meant "process and output," i.e., "taking something from an encoded form ... and translating it into a sound signal, whether that be electrical or ... physical." Dkt. No. 349, Ex. A, at 98:20-99:7.
Second, Dr. Wolfe's opinion that a person having ordinary skill in the art would understand that "transmitting audio data packets over a network does not amount to 'process[ing] and output[ting] audio,' " Wolfe Rebuttal Report ¶ 218 (alterations in original), is not inconsistent with Judge Andrews' claim construction order. In his report, Dr. Wolfe cites a number of Sonos's patents that "describe transmitting audio data over a network and playing/outputting audio as distinctly different functions." Id. A device that only sends and receives network data packets would not be processing and outputting audio. Further, a "player" must be able to process audio and output audio "either in the form of an audio signal to an external speaker or as sound waves," Dkt. No. 219, at 15-16, which suggests that a "player" must output audio signal, and not only network packets. Dr. Wolfe's opinion is consistent with the claim construction order.
On this issue, D & M's motion is denied.
c. Sonos's Experts on "Copying"
D & M moves to strike the sections of Sonos's expert reports that state that D & M copied Sonos's patents in creating its HEOS products. D & M asserts *521 three grounds in support of its motion: first, that the opinions are not based on the experts' "scientific, technical, or other specialized knowledge," Fed. R. Evid. 702(a) ; second, that the opinions will not "help the trier of fact to understand the evidence or to determine a fact in issue," id.; and third, that the opinions are contrary to 35 U.S.C. § 298, which prohibits using the absence of advice of counsel to prove that the accused infringer willfully infringed. The Court concludes that expert testimony on the issue of copying is not likely to be helpful to the jury, which is fully competent to evaluate the evidence and draw its own conclusion about whether D & M copied Sonos's technology and products. The Court therefore grants D & M's motion.[4]
In his opening report, Dr. Almeroth summarized the evidence he viewed as indicating that D & M evaluated and copied Sonos's patented technology. See Almeroth Report ¶¶ 601-51. Dr. Almeroth first reviewed the evidence that D & M was aware of Sonos's patents and that D & M sought to make products with Sonos-like features. Id. ¶¶ 603-08. He then categorized that evidence based on the different groups of patents Sonos is asserting. Id. ¶¶ 610-30. Finally, he analyzed additional evidence of purported copying, such as the naming, branding, marketing, user experience, and industrial design of the HEOS by Denon products, id. ¶¶ 631-51. Dr. Almeroth's reply report and the expert reports from Mr. Tate and Dr. Wolfe drew similar conclusions based on the evidence presented.
To be admissible, the expert testimony "must be capable of 'help[ing] the jury to understand the evidence or to determine a fact in issue.' " Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC, No. 13-cv-324, 2017 WL 3528606, at *3 (D. Del. Aug. 16, 2017) (quoting Fed. R. Evid. 702 ). When a factual issue is "equally within the competence of the jurors to understand and decide," expert testimony is not helpful to the jury and, therefore, not admissible. Oxford Gene Tech. Ltd. v. Mergen Ltd., 345 F.Supp.2d 431, 443 (D. Del. 2004) (quoting McGowan v. Cooper Indus., Inc., 863 F.2d 1266, 1273 (6th Cir. 1988) ); see also Aponte v. City of Chicago, No. 09-cv-8082, 2011 WL 1838773, at *2 (N.D. Ill. May 12, 2011) ("Expert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony.").
Dr. Almeroth's qualifications as an expert in this action, which are based on his education and work experience, are not pertinent to his conclusions about copying. The jury may draw its own inferences, for example, about the similarities between the names "HEOS" and "Sonos" and between the product lines, such as the "PLAY:5" and the "HEOS 5." See Almeroth Report ¶¶ 633-37. The jury would not be aided by expert testimony in that regard. Those portions of Dr. Almeroth's report are summaries of evidence and conclusory statements that imply that D & M copied Sonos's technology. Such "unhelpful restatement[s] of the facts as [the expert] sees them" are inadmissible. RSI Corp. v. Int'l Bus. Machines Corp., No. 08-cv-03414, 2013 WL 1087468, at *4 (N.D. Cal. Mar. 13, 2013) (striking the declaration of an expert hired to express an opinion on willfulness). Because Mr. Tate and Dr. Wolfe rely on Dr. Almeroth's opinion on copying, Dkt. No. 348, at 10, the portions of their reports that discuss copying are also excluded.
*522 Sonos may, of course, still present evidence of copying to the jury; it just may not do so by invoking the special imprimatur that accompanies its presentation by an expert. See K-TEC, Inc. v. Vita-Mix Corp., 696 F.3d 1364, 1378 (Fed. Cir. 2012) (evidence of copying relevant in question of willful infringement).
d. Dr. Wolfe's Opinions on the Conception Date of the '556 Patent
Finally, D & M moves to strike Dr. Wolfe's opinion that the '556 patent has a priority date at least as early as August 31, 2010, rather than July 19, 2011, which is the date that the '556 patent was filed and the date Sonos had previously asserted as the priority date for that patent. This dispute matters because it bears on the question whether U.S. Provisional Application No. 61/378,639 (the "Castor-Perry Provisional"), which was filed on August 31, 2010, is eligible to be considered as prior art in this case.
Sonos did not assert the '556 patent in its original complaint, filed on October 21, 2014, or in its first or second amended complaints. On January 29, 2016, Sonos sought leave to file a third amended complaint that asserted seven new patents, including the '556 patent. In response to an interrogatory, Sonos stated on October 10, 2016, that "the subject matter claimed in the '556 Patent was conceived and reduced to practice at least as early as July 19, 2011." Dkt. No. 316, Ex. E-17, at 9. Sonos served a request for admission that "the Asserted Claims of the '556 Patent are entitled to a priority date of July 19, 2011," which D & M admitted. Dkt. No. 316, Ex. E-30, at 44-45.
Then, on January 18, 2017, in its final invalidity contentions, D & M for the first time claimed the Castor-Perry Provisional, among other new references, as prior art. Sonos moved to strike the new prior art references. Dkt. No. 247. Judge Andrews denied the motion at a discovery conference. Dkt. No. 253. Dr. Kesan subsequently stated in his February 2017 report that the Castor-Perry Provisional is prior art to the '556 patent. Dkt. No. 307, Ex. A ¶ 115. Sonos's expert, Dr. Wolfe, responded in his rebuttal report, dated April 17, 2017, that the '556 patent was entitled to a priority date at least as early as August 31, 2010. Dkt. No. 315, Ex. E-15 ¶ 1283.
D & M complains that if Sonos's interrogatory responses required amendment, "Sonos had an obligation to do so in a timely fashion." Dkt. No. 366, at 9. But Sonos has done just that. The parties anticipated that this sort of development might occur. They stipulated to, and the Court entered, a scheduling order that stated that "a party may supplement its interrogatory responses to incorporate material timely disclosed in an expert report within ten days after service of the replies to expert reports." Dkt. No. 210 ¶ 9. Expert reply reports were served on May 9, 2017, and on May 19, 2017, Sonos timely amended its interrogatory responses to recite the August 31, 2010, priority date. Dkt. No. 316, Ex. E-19 at 10. Sonos's disclosure is therefore not contrary to any court order or scheduling agreement.
Even if Sonos's change of position regarding the priority date of the '556 patent were untimely, the Court would not strike it. In determining whether to exclude untimely or improper expert disclosures, the Third Circuit has instructed that district courts consider the following factors: "(1) the surprise or prejudice to the moving party; (2) the ability of the moving party to cure any such prejudice; (3) the extent to which allowing the testimony would disrupt the order and efficiency of trial; (4) bad faith or willfulness in failing to comply with the court's order; (5) the explanation for the failure to disclose; and (6) the importance of the testimony sought to be *523 excluded." W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc., Civil Action No. 11-515, 2015 WL 12806484, at *4 (D. Del. Sept. 25, 2015) (citing Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904-05 (3d Cir. 1977) ).
These factors weigh against striking Dr. Wolfe's opinion. D & M has not been unfairly prejudiced by Sonos's failure to make an earlier disclosure of its contention as to the 2010 priority date. Dr. Wolfe relied on evidence produced during discovery to reach his opinion as to the proper priority date, and D & M's expert, Dr. Kesan, has presented counterarguments to Dr. Wolfe's opinion. Dkt. No. 308, Ex. B ¶ 31. Moreover, the issue arose early enough that it appears unlikely to interfere with the parties' trial preparation and will not disrupt the trial schedule. Nor is there any suggestion of bad faith on the part of Sonos in revising the priority date in light of the discovery proceedings. The Court therefore declines D & M's request to bar Sonos from relying on the 2010 priority date at trial.
Contrary to D & M's argument, this case is not like Harvatek Corp. v. Cree, Inc., No. 14-cv-5333, 2015 WL 4396379 (N.D. Cal. July 17, 2015), in which Judge Alsup struck the "at least as early as" language from the plaintiff's interrogatory response regarding the priority date for the patent in suit. Id. at *3. There, the plaintiff introduced new evidence to argue that its patent was entitled to an earlier priority date months after the deadline for the required disclosures under that court's local patent rules, without seeking leave to supplement its disclosures or production. Id. at *1. For that reason, the court held that the plaintiff was in violation of the court's local rules, which the court said "must have teeth if they are to have any effect." Id. at *3. Here, D & M has not suggested that Sonos has violated any discovery requirement, court order, or the local or federal rules. On the contrary, the parties have acknowledged that their contentions would not be finalized until the end of the expert report stage, by stipulating that the parties could amend their interrogatory responses after the exchange of expert reply reports. Sonos has acted consistently with the parties' agreement and the Court's scheduling order.
Accordingly, the Court denies D & M's motion to strike Dr. Wolfe's opinion regarding the priority date of the '556 patent.
IT IS SO ORDERED.

See Ericsson, 773 F.3d at 1226 ("Logically, an economist could [calculate reasonable royalty in a multi-component product] in various ways-by careful selection of the royalty base to reflect the value added by the patented feature, where that differentiation is possible; by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof. The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product.").

During oral argument, Sonos responded that even though many consumers do not own multiple devices, they would not have purchased the Sonos or HEOS product if it lacked the synchronization, group volume control, and pairing features. Even assuming this to be true, a component may be essential without being the sole driver of market demand, as LaserDynamics illustrates.

A simple example illustrates the point. Suppose companies A and B each enjoy 10% market share, and C controls the rest. If B infringes A's patents and B could not produce a commercially successful non-infringing alternative, A may be entitled to lost profits. But it would be improper to assume that A would have received all of B's sales, rather than assuming that C would have taken at least some (and probably most) of those sales.

While the Court agrees with D & M that Sonos's proffered expert opinions on copying are inadmissible under Rule 702, the Court finds D & M's argument based on section 258 to be without merit.